UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Steve Loren,                                    CASE NO-13  CIV  7597
CV7597
Plaintiff,
vs.                                             Complaint
The New York City Department                    Jury Trail
Demanded
of Education and Dennis
Walcott as Chancellor of the
New York City Department of                     **First Amended**
~~Complaint~~
Education, The Relay graduate
School of Education, PS
x089,Ralph Martinez, Nicole
Hill, Marisol Alicia
Ferguson,and various " John
Does"
            Defendants

**Nature of the Action, Jurisdiction and Venue**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2|6|14
```

1.This is an action arising out of the deprivation under color of

statute, ordinance, regulation, custom. or usage of rights,

privileges, and immunities secured to plaintiff by the

Constitution and Laws of the United States of America and the violation

of the laws and statutes of the State of New York, out

of various breaches of New York state law by the NYC Department

of Education, Relay Graduate School of Education and various

individuals and entities associated directly or incidentally

with the NYCTF program, Relay Graduate School and PS X089 while

plaintiff was associated with these entities.


2. This- Court. has jurisdiction. over" the subject matter of

this lawsuit by virtue of:

U.S.C. §1983, 28 U.S.C. §1331, 28 U.S.C. §1343 and 28 U.S.C.

§1367,28 U.S.C 1332,and 28 U.S.C § 1367.

Furthermore, this court has jurisdiction over the matter at hand because

of Federal constitutional questions raised and the supplemental jurisdiction of the court to hear state claims that are a part of the same case and controversy ( 28 U.S.C 1367)

All Federal and state law claims arise from the same common nucleus of operative facts and are united by a common course of action. Plaintiff is alleging Violations of the First,Fourth, Eighth and Equal Protection( Derived from 5th and 14th amendments) provisions of the United States Constitution. Plaintiff, by way of claims under U.S.C. §1983, alleges violations of any and all constitutional amendments that may be cognizable under the facts articulated in this matter.

3. Venue is properly laid in the Southern District of New York because some or all of the defendants are residents of the Southern District and because most or all of the events giving rise to the claims set forth herein took place within said District. To the extent any "John Doe" defendants are discovered to not reside in the Southern District of New York, then the plaintiff invokes the diversity jurisdiction of this court as the damages claimed are in excess of $75,000.

**The Parties**

4. Plaintiff is an individual and resides in the State of New York.


5. Defendant New York City Board of Education (the "Board") is a municipal corporation organized under the laws of the State of New York. The principal purpose of the Board of Education is to operate the New York City public school system.

6. Defendant Relay Graduate School is a private university with a NYC campus where plaintiff attended classes.

7. Defendant PS x089 is a public School located in the Bronx,

NY

8. Defendant Nicole Hill is  - school teacher at P.S
X089 in the Bronx and resides within the Jurisdiction of the
Southern District of New York.

9.Upon information and belief, Defendant Alicia Marisol
Ferguson is a resident within the Southern District
jurisdiction, and if not, the Diversity jurisdiction applies.

10. During all relevant times, Dennis Wolcott was the
Chancellor of New York City Public Schools. Wolcott is sued in
his individual and official capacity.

11. During all relevant times, Ralph Martinez was the
Principal of PSx089.Martinez is sued in his individual and
official capacity.

12. During all relevant times Ms. Nicole Hill was employed as
a teacher at PS x089 and is sued in her individual and
professional capacity

13. During all relevant times Marisol Alicia Ferguson was
employed by the NYCTF program and is sued in her individual and
professional capacities.

14. John Doe's as accomplices and co-conspirators, yet to be
named, are sued in their individual and professional capacity.

**Fact Allegations Common To All Causes Of Action**

15. On or  about July of  2000, the New "York State Department of
Education promulgated alternative teacher certification
requirements, codified at Section. 80—5.13 of Title 8 of the
Official Compilation of Codes, Rules and Regulations of the
State of New York; (8 NYCRR. 80~5.13). These new regulations
provided an alternative route to permanent teacher
certification, establishing a "Transitional B certificate,"

3

principally to streamline the process by which talented and educated individuals from other walks of life could change careers and become teachers.

16. At about the same time, the City and the Board established a program called the NYC Teaching Fellows. The Teaching Fellows Program provided a wide array of incentives to attract individuals to obtain Transitional B certificates and teach in the New York City public school system. Among other things, successful candidates received the initial education and training required for the Transitional B certificate at no cost, and they received a tax free stipend during that training. At the conclusion of the training, they were hired by the Board at full teacher's pay. The Teaching Fellows Program would also subsidize nearly the the full cost of obtaining a Masters Degree over the ensuing two years, which was necessary for permanent certification.

17. Upon information and belief, the alternative teacher certification and NYC Teaching Fellows program were established in the face of a shortage of teachers and in recognition of the fact that the existing system was not working and that many students were being failed by public school systems in the State of New York.

18. On or about April 2012, plaintiff was accepted into the NYC Teaching Fellows program as a Math fellow.

19. Only 90 of the 900 co--hort for that year were chosen as math fellows and upon information and belief the standards were more stringent for the math co hort than for the majority of other fellows who were hired into the field of special education.

4

20. Sometime in May of 2012, plaintiff participated in an 8 day
"math immersion" class at Relay Graduate
school. All NYCTF math and science fellows participated in
this and similar immersion training to help prepare them for
the Content Specialty Tests(CST)that were required to be passed
for the issuance of the "transitional b certificate" that would
allow fellows to teach in the upcoming school year. Plaintiff
passed the initial relay math assessment test as well as the
class and final assessment. Plaintiff took the  state Math  CST
004 sometime in June and passed with high marks.

21. Sometime starting in May of 2012, Relay contacted plaintiff
and requested official undergraduate Transcripts be provided,
else Relay could not officially accept plaintiff into the
Graduate education program. By this time, plaintiff
had already provided relay with official MBA transcripts and
unofficial transcripts from his undergraduate studies.
Plaintiff pointed out to Relay that their own student handbook
clearly states that official transcripts from either a graduate
program or an undergraduate program would be sufficient for
admission. Official transcripts from both Graduate and
undergraduate institutions were not required for  admission as
per their own policy.( ▬▬▬▬▬▬▬)
Furthermore, the regulations applying to Graduate
schools of education in NY statutes governing alternative
teacher certification used language that clearly stated that
either Undergraduate or Graduate transcripts were sufficient
for admission. There was no requirement that both be submitted.

22. At. this time,plaintiff had a financial block on his
undergraduate transcripts, and it would take time and

5

expense to obtain  the release of these transcripts. Relay
continued to demand these transcripts despite this being in
contravention to their own policy and the law governing these
institutions as well as an unnecessary burden to plaintiff.
Plaintiff later found out that other Relay students who did not
provide official undergraduate transcripts were not  similarly
threatened with removal for not providing these transcripts.
23. Plaintiff had no choice but to comply as he was at one
point denied access to an online learning portal necessary for
him to continue to  perform required coursework. In addition,
relay gave the plaintiff a date certain for him to provide the
requested documents else he would be removed from the program.
Plaintiff had no choice but to expend considerable time and
expense and eventually obtained the requested documents.
Importantly, plaintiff was considerably inconvenienced by the
lack of computer access Relay chose to apply to him in a
discriminatory manner and was thereby hindered in completing
Relay assignments an  staying abreast of program requirements
and deadlines. This series of events is but one instance of a
pattern of discriminatory action exhibited by Relay toward the
plaintiff, and that resulted in harm to  his overall
participation in the program.
24. Sometime after receiving plaintiffs official transcripts
for his undergraduate studies, Relay sent an official offer of
admission that included an unusual and completely unique
condition: a media waiver.
Out of the approximately eight Graduate institutions that
cooperated with the NYCTF program in providing graduate
education and subsidized masters degrees, Relay was the only

6

one that had

a media waiver condition attached to its acceptance letter. The media release indicated that any of Relay students could be filmed in classes at any time and that the video's would be the property of Relay. Furthermore, Relay students would have no control over how these records would be used and with whom they would be shared. In addition, the waiver stated that Relay may receive monetary and other consideration from the use of these video's and that students waived their right to any consideration. In addition, students waived any right to damages if any video resulted in a  portrayal that was not acceptable to, or objectionable to, the student.

25. Plaintiff was uncomfortable with this unprecedented waiver language and contacted officials at the NYCTF as well as Relay to communicate his concerns. Plaintiff believed that the acceptance document involved a waiver of FERPA protections and rights and that this waiver was an unacceptable condition for admission.

In effect, admission to Relay required the relinquishing of FERPA rights and protections as Videos of students are used in the Relay grading process and as such, are properly understood as student records subject to FERPA legal protections against disclosure. In fact, Relay clearly expressed that classroom observations involving video recordings were weighted highly in Relays grading methodology. Relays strong emphasis on Video recordings as important elements in the pedagogical process was unique in the various graduate schools of education that comprised the NYCTF program.

It is important to note that the plaintiff has no issue

whatsoever in the use of video recording as a pedagogical tool, and in fact made use of video recording himself as early as the interview process, before even being offered admission into the program, and again during the pre—service training period. Plaintiff simply disagreed with a waiver that denied his rights to the use of such video records, how and with whom they would be shared, and the lack of control over their use. Plaintiff contends that Relays acceptance letter results in an illegal waiver of FERPA protections and is therefore a violation of law that affects the public interest. There is a strong public policy interest in preserving the effect of the FERPA laws, and any illegal means used to usurp these protections ought to be brought to the light of those with the means to address this issue. Plaintiff did precisely this by contacting officials at the NYCTF as well as Relay regarding this matter. It is important to note that FERPA protections have routinely been invoked in matters that bear on the public's health and safety.

26.At about this time, plaintiff also inquired as to the possibility of switching from Relay GSE to a Graduate school closer to where he lived in queens. The NYCTF denied plaintiffs request to transfer to St Johns, which was less than a 10 minute drive from his residence in queens.

27.After discussion with Relay representatives, relay sent plaintiff revised documents with altered language regarding the media release. Plaintiff continued to find fault with the language of the first revised agreement. Plaintiff eventually signed an acceptance document after Relay sent a second revision of the waiver language.

28.Plaintiff was assigned to PS x089 in the Bronx for his field

experience beginning sometime in early July. Field experience is intended to provide the Teaching Fellow with mentored teaching and practice in his grade and subject area.

29. Plaintiff was the only math fellow assigned to PS X089 who was not assigned to an appropriate grade level and subject. The three other math fellows at x089 were assigned to appropriate grade and subject classes. In fact, appropriate subject and grade classes were available at PS X089 but denied to plaintiff and instead given to much younger teaching fellows, some of whom were not even math fellows.

30. Plaintiff later learned that it was likely that he was the only one of the full 90 member math co hort city wide to be in this situation based on conversations with other math fellows over the course of pre service training period. (approximately 7 weeks)

Upon information and belief, denying plaintiff the appropriate field experience where this was available is a violation of NYS statutes and regulations governing the transitional b certificate program.

31. During his time at ps X089, where the intention of field experience is to provide as much classroom teaching experience as possible to the developing teacher, plaintiff instead spent much of his time addressing faulty computers and difficulties with an individualized self paced computer learning program( this program was called I Ready) with his third grade summer class.

Upon information and belief, these computers were purposefully Compromised and/or deliberately assigned to thwart plaintiff's

9

development in the program(of course, the students suffered
from the faulty computers/software as well and plaintiff
expended considerable effort in trying to address the
computer/software problems with I-Ready customer service)
The computers experienced incessant difficulties in logging
onto programs, holding a charge and exhibited erratic behavior
etc. Despite bringing these issues to the attention of those in
authority at P.S x089, no action was taken to replace the
defective computers and no IT specialist was provided to
address the incessant computer issues. In addition, a summer I
ready manual that could have assisted in addressing some of the
software issues was never provided early on during the field
experience, and  was only belatedly  provided by an assistant
principal after plaintiff contacted I Ready customer service
numerous times to address various issues and finally learned of
the existence of such a " manual". It should be noted that the
"software" issues were distinct from the computer hardware
issues described above.

32. On or about the second week into the 4 week "field
experience" plaintiffs mentor teacher was 'excessed' by the
school principal.

The term "excessed" denotes removal of a teacher from a
particular school. This action is similar to a firing, however,
teachers have Union protections that dictate that excessed
teachers can interview for positions at other schools.
Excessed teachers also receive a salary while searching for
work. However, the excessed teacher can no longer work at the
particular school they are excessed from, and in that sense,
being excessed is similar to be fired. Upon information and

belief, plaintiff is the only one of the full 900 member
Co--hort to be paired with an excessed teacher. Upon
information and belief, continuing to be paired with an excessed
teacher is a violation of NYS statutes and regulations
governing the transitional b certification program.

35.Plaintiff was purposefully thwarted from teaching an age
and grade appropriate math class on a number of occasions while
at p.s x089.Upon information and belief a number of individuals
conspired to deny plaintiff this experience, and conspired to
thwart plaintiffs successful completion of the program. These
individuals include, Marisol Alicia Fergusen, Nicole Hill,
assistant principals and principals PS at X089, and other
participants in the NYCTF program and other John Does.

36.Plaintiff at one point was forced to be observed by his
coach, Marisol Alicia Ferguson and her supervisor Christie
Clark where the class he had prepared for was canceled at the
last minute and where he was forced to teach in a
different class without the benefit of a lesson plan or any
preparation. On this occasion, plaintiffs co teacher Jacob
Sugar( plaintiff was scheduled to co teach the middle school
grade class for which he had prepared a lesson ) called in
sick at the last minute.

Plaintiff then prepared his lesson to cover for both himself
and his absent co —teacher. Ultimately, and at the last
possible moment, plaintiff learned that the class was preempted
by the actions of the principal or assistant principal by way
of scheduling a music lesson at the time plaintiff was supposed
to teach. This action and others, upon information and belief,
constitute a pattern of conspiracy by said individuals and

11

possible others not  so named, to thwart plaintiffs successful

completion of the Pre Service Training program.

34.Ms. Hill, a teacher who was to host plaintiff in teaching

middle school math classes after his original cooperating

teacher (Maribel Garcia) was excessed, systematically thwarted

and repeatedly undermined any opportunity for  plaintiff to

teach in her classroom.

35.Ms Hill acted in cooperation with plaintiffs coach, other

teaching fellows and other NYCTF personnel and personnel from ps

x089 to deny plaintiff an opportunity to teach and acted to

portray plaintiff in an unfavorable light.

36.Upon information and belief, plaintiff was the only teaching

fellow at ps x089 over 40 years of age.

37.Upon information and belief, plaintiff, due- to his high

degree of formal education and number of college

credits earned , was eligible for the  highest level starting

salary among his teaching fellow cohorts. This salary would be

approximately $58,000 vs ea salary of  approximately 45,000 for

the majority of the cohort.

38. Plaintiffs teaching mentor, who had been excessed,

expressed find she believed that the principal excised her due

to her age and relatively higher salary, and that he wanted to

make room for the lower cost and younger teaching fellows.

39.A  review of Department of Education policy and facts over

the last decade reveals a continuing pattern of weakening

teacher tenure protections, pruning high salary teachers from

the teaching force(resulting in a predominance of disciplinary

charges being brought against older teachers),and in general

implementing policies aimed at lowering the costs of teachers

through the use  of alternative certification programs, diminished

union contractual benefits and other means. These policies have

had a disparate impact on older teachers. These facts

demonstrate a policy of disparate treatment, as any examination

of the infamous "rubber rooms" will make readily apparent.

40. Plaintiff was removed from the NYCTF program by way of e

mail communication on July 31st 2012, a mere two days

before the completion of his "field experience". Plaintiff was

removed without prior warning and was only two days away from

securing all the requirements to obtain his transitional

b certificate. Plaintiff was therefore a mere few days away

from having the benefit of the protections of the UFT (United

Federation of Teachers). This abrupt removal had no legitimate

basis.

41.Upon information and  belief,the  x089 teacher,Ms. Nicole

Hill, made statements and representations to other X089

personnel and NYCT fellow representatives,that portrayed

plaintiff in a false and negative light and which contributed

to the conspiracy to cause plaintiffs removal from the program.

42) Plaintiff avers that he was respectful at all times and in

all interactions with all personnel at x089 and the  teaching

fellows program. Any representation  to the contrary constitutes

slander upon the plaintiff.

**Causes of Action**

All of the above facts and circumstances are repeated in their

specificity and completeness in each and every cause of action

described below.

All causes of action, Federal and State, specified below are united by

the intentional sabotage of plaintiff in his completing of the NYCTF

program by the various actions of defendants. All causes of action
therefore arise from the same case or controversy between plaintiff and
defendants.

**Federal Causes of action**

The causes of action described below are united by the effort to
sabotage plaintiff in his ability to complete the pre service training
and be eligible to become a NYC Teacher. The particular circumstances
regarding who, what where and when regarding defendants actions if they
are not specified below, are available under the relevant facts
articulated above under "Fact Allegations Common To All Causes Of
Action".

**Section 1983 Claims**

**Defendants,as individuals or state actors( as is the case with the
NYCDOE) acting under color of state law, deprived plaintiff of numerous
constitutionally protected rights as follows:**

**1)Violation of the First Amendment protecting free speech.**

The NYCDOE violated plaintiffs free speech rights by terminating him for
speech that made the NYCDOE aware of violations of Federal Law,
specifically the Family Educational and Privacy Act 20 U.S.C §
1232(FERPA). The violations of FERPA were embedded in policy enacted at
a participating Graduate School of Education( namely, Relay GSE)where
plaintiff was assigned for his Graduate studies. The policy in question
was a waiver document that students were required to sign as a condition
of enrollment at the Relay Graduate School of Education.( **See Exhibit A,
Relay Admission Agreement**) The waiver document in question specified
that relay students would have no control or ownership rights over
various "recordings"( video or otherwise) that may be made of their
teaching or other activities while enrolled in the program. Not only
would relay students have no control  over who would receive or view

14

such recordings of their teaching activities or other activities while participating in the teaching fellows program, students, by signing the waiver, also forfeited their right to sue, protest or have a say in how they may be portrayed in such recordings, or otherwise have a right to damages if they were adversely affected by such portrayals. In addition, Relay students would be denied any economic benefits that may accrue to Relay or its partners by virtue of these student recordings. The waiver that Relay required students to sign as a condition of enrollment therefore constitutes an impermissible forfeiting of a Federally guaranteed protection of student records and therefore constitutes a violation of FERPA protections in fact. The waiver made no mention of FERPA laws, and that the signing of this document would constitute a waiver of FERPA rights. This non disclosure denies any defense to defendants that the waiver constitutes a legitimate forfeiting of these rights by those students who have indeed agreed to the terms of the waiver. Therefore, through allowing Relay GSE to in effect suspend FERPA protections as a condition of enrolling at Relay GSE, the NYCDOE condoned a policy of denying the protection of a Federal Statute that it itself is expected to enforce.

FERPA legislation has a broad definition of what constitutes "student records". Importantly, the Relay GSE has explicitly stated in official and unofficial communications that they will grade students based upon actual teacher performance as recorded through various media. Indeed, Relay provided video cameras to all students early in the Teaching Fellows Program with the explicit understanding that Video was a central and indispensable component of the learning and grading process for Relay students. Therefore, student videos constitute, in so far as they form the basis of student performance evaluation and grading as well as

15

material for learning, "student records" under the broad definitions of
the FERPA statutes. Video recording of student lectures are no different
that graded papers, Test results, report cards or other student
documents that provide the material to evaluate student progress and
performance. In fact page 47 of Relay GSE 2012-2013 student manual under
a discussion of FERPA titled "Eucation Records" states "The form in
which the information is maintained by Relay GSE does not matter; for
example, computerized or electronic files, audio or video tape,
photographic images, film, etc, with such information are " education
records".( **exhibit b**)

**Elements of the Claim of Violation of First Amendments rights.**

Violation of First Amendment Rights are actionable under § 1983.
Plaintiff claims that he made personnel of the NYCTF as well as Relay
GSE aware that the language of the Relay GSE waiver was unacceptable for
the reasons stated above. Plaintiff made these communications by phone
and through e-mail during his "personal time" away from any NYCTF
premises. Plaintiff therefore engaged in protected free speech conduct.
Plaintiff had e-mail contact with Kelly Boucher, Manager of Operations,
NYCTF program, RGE on at least 7/6/12, 7/9/12 and 7/11/12.
Plaintiff had e-mail contact with Shauna Hart, Director of Marketing
Recruitment and Communications, NYC Teaching Fellows Program on at least
7/2/12. Plaintiff recalls a few phone conversations with these and
perhaps other individuals regarding the Relay GSE media waiver during
this general time frame.
Plaintiff contends that in retaliation for his protected expression
regarding a policy that violates Federal Law, defendants took actions
to sabotage his participation in the pre service training period by way
of denying him appropriate subject and grade level teaching experiences,
repeatedly denying him available appropriate teaching experience,

16

thwarting and undermining prepared lessons, coordinating  and conspiring
to portray plaintiff in a negative light, sabotaging computers and
software that were made available in his assigned classroom,  all with
the intent to create a pre text for removing plaintiff from the program.
As a result of defendants sabotage, Plaintiff was later terminated  by
the NYCTF program. Plaintiff claims that any other reason provided by
the NYCTF for his termination was either erroneous or a pretext for his
removal from the program. Plaintiff thereby suffered an adverse action
at the hands of the NYCTF by being removed from the program
involuntarily.

Finally, plaintiff contends that the reason for his termination is
causally related to the protected speech he engaged in that revealed
violation of FERPA protections that were embraced as policy by the
NYCDOE and Relay GSE.


**2)Violation of the Eighth Amendment of Cruel and Unusual Punishment.**

The same activities above evidence violation of the plaintiffs Eighth
Amendment constitutional right to be free of Cruel and Unusual
Punishment.

Terminating an employee in retaliation for exposing violations of
Federal law( FERPA), where such violations clearly implicate public
policy considerations of health and safety, constitute Cruel and Unusual
punishment under the Eighth Amendment. Defendants clearly evidenced
deliberate indifference to plaintiffs circumstances by denying him the
ability to economically support himself, where such action is
exceedingly rare(upon information and belief less than ½ of 1% of
Teaching Fellows are involuntarily removed from the program, and
plaintiff is not aware of any other removal that was ascribed to
"performance" as contrasted to "gross misconduct"). The sheer rarity of

17

involuntary removal raises serious doubts that performance was the actual reason for plaintiffs removal and underscores the unusualness of the action taken by the Teaching Fellows.  The severity of an action that  deprives one of a livelihood for engaging in communications that exposes questionable policy is clearly cruel. The failure of NYCTF personnel to engage with plaintiff regarding the circumstances of his removal, and the denial to plaintiff  of any adjudication procedure or mechanism for review, as well as other  evidence indicating a  lack of concern for his situation or well being, all evidence an attitude of deliberate indifference. Acting to sabotage plaintiff in the performance of his duties during the pre service training period clearly provides evidence of an attitude of  deliberate indifference if not callous disregard to plaintiffs health and well being.

**3)Violation of Equal Protection  clause of the Constitution (Derived from 5th and 14 th amendment)**

The NYCDOE, as a state actor under 1983, has further violated plaintiffs equal protection rights as derived from the 5th and 14th amendments by failing to abide by state regulations that govern the NYCTF program. Plaintiff is not making a claim that NYDOE did not follow appropriate procedures in terminating him( a Due Process violation), rather , he is arguing that the NY CDOE discrinminarily denied plaintiff the statutorily guaranteed teaching experience that was available to him and yet denied for impermissible and discriminatory reasons. This is an equal protection claim under the United States constitution.
Part 52.21 of the Commissioners Regulations that regulate the NYCTF program states: The Introductory component shall include.......*field experience appropriate the the certificate title sought of at least 40*

*clock hours( emphasis added)*.Under Part 52.21 of the Commissioners Regulations that regulate the NYCTF, field experience is defined as " direct observation of teaching, participation in teaching, or teaching itself *that is related to the teacher education program in which the candidate is enrolled...*( emphasis added)" ( **see exhibit c**)

The appropriate field experience in plaintiffs case would have been a middle school math class. Not being placed in an appropriate class is not a minor matter, as there are statutorily different requirements regarding different teacher certifications. In fact, the appropriate experience is essential to preparing teachers due not only to subject matter differences, but distinct behavioral differences between children at different grade levels. A certification in High School math is distinct from a certification in Middle School math, just as a Certification in elementary science is distinct from one in English as a Second language. Different rules and requirements attach to each specific certification and there is no discretion to waive or alter these requirements. Plaintiff described above how middle school math appropriate teaching experience was made available to others who were not entitled to it, and also how the experience was available in other classrooms at x089 and inexplicably denied without reason or justification.

Plaintiff also described how he was likely the only teaching fellow in the 900 member cohort who was paired with an excessed teacher, which further violates the statutory requirements of the statutes governing the NYCTF program.    Part 52.21 (b)(5)(d) of the Commissioners Regulations reads: Teacher-mentor shall mean *an experienced and highly effective* certified teacher who is employed in the same high need school as the candidate and who is assigned to provide mentoring and support to a candidate.(emphasis added)"It should go without saying that excessed

teachers are not considered to be highly effective, In fact excessed
teachers are considered to be ineffective teachers. The fact that
plaintiff was the only fellow paired with an excessed an therefore an
ineffective teacher at x089 is evidence that  Plaintiff has had his
constitutional rights to equal protection under the law violated by the
facts herein alleged. Knowing that he was the only such math fellow at
x089 to be treated in this manner is evidence of discriminatory conduct.
The possibility that he was the only fellow in the entire cohort of 900
fellows to be treated in  such  a manner will constitute overwhelming
evidence of highly discriminatory conduct. As with all other claims,
plaintiff alleges that the equal protection violations of his
constitutional rights were undertaken with the intent to sabotage his
successful completion of the pre service training period of the NYCTF
program.

These violations denied to plaintiff equal protection under the law and
therefore evidence a constitutional violation. The circumstances
described clearly indicate that actors in the NYCTF program acted in a
discriminatory manner with respect to plaintiff.

**Bivens Claims**

The section 1983 constitutional  claims above ( claim # 1, #2 and #3)
are properly plead against defendants to the extent that they are
individuals or "state actors". Plaintiff is alleging further that a
Bivens action  applies to those actors who are unknown agents of the US
government ( " John Does"), or any of  of the defendants mentioned by
name or who ostensibly are employees of the NYCDOE, Relay GSE,

participants in the NYCTF program but who in fact are agents of the US government or who have been influenced by agents of the US government with respect to activities taken with respect to plaintiff. Plaintiff is making a claim against these actors for violations of his 4th, 5th, 8th and equal protection rights( as derived from the 5th and 14th amendments) under the US constitution.


**#4) Violation of the Eighth Amendment of Cruel and Unusual Punishment.**

The entirely of what is plead in the 2nd cause of action above is re-plead herein.

To the extent that US Government  defendants acted to deprive the plaintiff of his constitutional rights under claim #2 above, then plaintiff is making a Bivens claim against them for  the same actions described above.

**#5) Violation of Equal Protection  clause of the Constitution (Derived from 5th and 14 th amendment)**

The entirety of what has been plead in the 3rd cause of action is re-plead herein.

To the extent that US Government  defendants acted to deprive the plaintiff of his constitutional rights under claim #3 above, then plaintiff is making a Bivens claim against them for  the same actions described above.


**#6) Violation of the Fourth amendment for Unreasonable Search and Seizure and to be free in the integrity of ones body and mind, Violation of 5th amendment for deprivation of liberty  and Violation of 8th amendment for infliction of cruel and unusual punishment  by engaging in non consensual behavioral research and manipulation.**

21

Plaintiff is  making a 4th amendment claim for unreasonable search or
seizure since it is alleged that  it was the intention of agents of the
NYCTF and or US Government to engage in behavioral research and
manipulation without the informed consent of the plaintiff in violation
of his right to be free from invasion and be secure in his body and
mind. Such non consensual use of behavioral research clearly violates
the 5th amendment  constitutional prohibition against deprivation of
liberty and well as the eighth amendments prohibition against cruel and
unusual punishment.

Plaintiff is well aware that this claim is controversial, however there
is ample factual historical precedent for these claims.

In the wake of the Church Committee hearings in the 1970's there has
been the general opinion that the unconstitutional behavioral and other
non consensual human experimentation that was conducted by military and
intelligence agencies with the cooperation of various civilian
institutions( such as universities and hospitals) was decisively put to
an end. In fact, many authorities that have studied this history and the
law that purportedly would prohibit such experimentation argue to the
contrary. An opinion piece published in" The Bulletin of Atomic
Scientist in 2009  makes the case that illegal and non consensual human
experimentation likely continues to this day.( see " Outlaw  Non
Consensual Human Experiments Now" Bulletin of the Atomic Scientists,
June 16th 2009)

After revelations that the US conducted cold war radiation experiments
on US citizens without their knowledge or consent, President Bill
Clinton established the Advisory Committee on Human Radiation
Experiments(ACHRE) in order to make recommendations to prevent such
heinous human experimentation from ever taking place again. The ACHRE
Final Report concluded that "with respect to classified research, the

current requirement of informed consent is not absolute;if consent is waived, the research may proceed in ways that do not adequately protect the research subject".( see ACHRE Recommendations regarding classified research and the Clinton Administration response here

https://www.fas.org/sgp/library/humexp/part2.htm ) The ACRHE report published in 1995 clearly states that existing statutes , executive orders and other mechanisms thought to be in place after the abuses revealed by the Church committee investigation into government non consensual human experimentation on unwitting Americans does not bar the continued possibility of  non consensual human experimentation on unwitting Americans. ACHRE made their recommendation in 1995 and President Clinton issued a memorandum two years later that included some of the ACHRE prescriptions.  Due to various bureaucratic delays, the Department of Health and Human services published it as an interim proposal in  the Federal Register in 2002. However, it remains unapproved by the appropriate agencies and departments. The author of the article published in the New Bulletin of Atomic Scientists  states that " the U.S government is no more restricted in carrying out non consensual classified research on human subjects than it was after World War II." The current  binding regulation on human subject research for 17 federal agencies including the military and intelligence agencies is the 1991 Federal Policy for the Protection of Human Subjects(**Title 45 CFR Part 46** ). Despite providing guidelines for informed consent, the  document also states that " Unless otherwise  required by law, department or agency heads may waive the applicability of some or all of the provisions of this policy"(**CFR Part 46 Section 46.101(i)**). Therefore, until a federal  statute  is enacted that secures the right to informed consent, the US government has the power to continue to carry out classified human experimentation on unwitting US Citizens by simply

waiving the informed consent requirement as it sees fit. Despite historical efforts to enact such a statute, even in the face of scandal and public outrage, no such statute has in fact become enacted. Instead of laws, various executive orders, memoranda and other executive quasi rule makings that have waived the right to sue or be enforced by private litigants,have been promulgated over the years to ostensibly protect the interests of subjects of Non Consensual Classified research. These facts demonstrate that constitutional violations of US citizens rights through non consensual human experimentation can continue to this day with virtual impunity.

To better comprehend the contemporary plausibility of such non consensual human behavioral experimentation, it is instructive to take a closer look at some of the actual history as revealed in a recently decided Federal case involving Vietnam veterans who were used for various top secret experimental studies.(see **4:09-cv-00037-CW**) This case is instructive for the sheer depth of historical record included in the filings that include relevant testimony from the Church committee Hearings in the 1970's and as well as numerous government documents that describe the depth and breadth of various secret programs that involved unwitting American citizens. In the Third amended complaint at point 115 it is stated that "CIA Director Allen Dulles approved Helm's proposal and a covert CIA mind-control and chemical interrogation research program 'MKULTRA" was created" The ACHRHE report previously **m**entioned stated that " Through the course of MKULTRA, CIA sponsored numerous experiments on unwitting humans". Testifying before the congressional Church committee in 1977, Dr Sidney Gottlieb, who became director of the Chemical Division(which controlled the MKULTRA projects) within the technical services division of the CIA, stated that

24

the mission was to " investigate whether and how it was possible to modify an individuals behavior by covert means". A 1963 CIA IG report by J.S Earman listed activities as being appropriate for investigation under MKULTRA included " devices for the remote measurement of physiological processes". The "final phase of testing MKULTRA materials involves their application to unwitting subjects in normal life settings".Project 119 formally launched in 1960 was designed to research, study and interpret " bio electric signals from the human organism, and activation of human behavior by remote means".The court documents also refer to a FOIA documents that reveal a program called Pandora which was investigating whether carefully controlled microwave signal could control the mind.

A review of the voluminous documented record that this case has complied makes it clear that a broad range of secret technologies were used on unwitting citizens in violation of constitutional protections as well as the statutes governing the permissible activities of some agencies in question. The legal analysts who have come to the conclusion that this kind of experimentation is in fact still possible under the existing legal regime, emphasize the competing interests of national security versus human research protections and how the latter are often trumped in practice. Clearly, in a post 911 world, it is reasonable to conclude that the pendulum of actual practice has swung even further to the national security side. Recent news regarding the heretofore unimaginable activities and capabilities of agencies entrusted to protect the security of Americans buttress the notion that constitutional protections have indeed been sacrificed to the imperatives of national security. The fact that many in our own Government have remained oblivious to recently revealed clandestine activities that have violated the deepest and most treasured guarantees

of our constitution serves as a caution to those who unreflectively
believe that the current system of checks and balances is up to the task
of safeguarding the highest law of the land. The reasonable conclusion
that National Security concerns have in fact often trumped
constitutional guarantees does not demonstrate the  suspension of the
constitution however, and the courts remain only forum where injured
parties have even the possibility to protect their interests and pursue
justice.

The historical record indicates that justice for the victims of such
government crimes is quite  rare, and current legal mechanisms do not
appear to offer an adequate remedy even for those who have overcome the
implicit skepticism regarding the nature of the harm done to them. In
Ritchie v The United States( see CV-00-03940-MHP), the appellate court
notes in footnote 8 of page 7131 " we think it is quite possible that
everything Ritchie says happened did happen-that Ritchie was drugged by
his own government, and suffered great personal and financial hardships
as a result."Yet, despite the courts view, Ritchie's efforts to obtain
justice failed and the only forum and mechanism  our system currently
provides for redress of such grievances may have failed to serve justice
as well. In an article published on January 24,1994 in US News and World
report titled "the Cold War Experiments" authored by Stephen Budiansky,
Erica E. Goode and Ted Guest,it is noted that "Internal memos and
depositions taken from CIA officials....reveal that of the hundreds of
experimental subjects used in MKULTRA, only fourteen were ever notified
and only one was compensated for $15,000".

In his 1999 New York Times review of book,Undue Risk, Secret State
Experiments on Humans, Johnathan Moreno expressed the view that national

26

security concerns will outweigh human subject protections:" At some
point, when information is needed about how human beings will react to
new forms of weaponry, human experiments will have to continue in this
business"

And continue it has. Plaintiff is claiming that covert behavioral
research was a motivating factor behind the sabotage of plaintiffs
candidacy in the NYCTF program and that plaintiffs have violated his
constitutional rights by engaging in such activities. Although the
precise motives , intentions, techniques and technologies used to engage
in the  secret behavioral experimentation that plaintiff alleges are
necessarily hidden, some observations can be described at this juncture.
• Plaintiff previously described how a co teaching assignment scheduled
on or about July 25th 2012 in MS Hills class was sabotaged, first by his
co-teacher calling in sick at the very last minute, and then later,
after plaintiff had prepared to teach the entire class, discovering that
the class he was to teach was preempted by a music lesson scheduled by
an assistant principle. Plaintiff during the days prior to this planned
lesson noticed that he had an unusual reaction to the printing paper in
the teacher resource room that was utilized by teaching fellows to plan
lessons. The teacher resources room contained multiple computers and at
least one printer that was jointly shared by fellows. Plaintiff noticed
that the paper made him feel nauseous and ill, however, he did not
notice similar complaints from other fellows regarding the paper.
Instead of utilizing the paper provided by the school, plaintiff brought
in his own paper when he needed to print various documents such as
lesson plans, and he found this solution to be adequate to avoid the
physical symptoms he experienced from the paper provided at the school.
Plaintiff contends that the paper that caused him discomfort was in fact

designed to cause this behavioral response, and that individuals associated with x089 and or the NYCTF program, intended plaintiff to potentially fall ill and  intended him to thereby either miss his class or otherwise be unable to perform his duties in teaching his classes. It should be noted that the only strict policy that the NYCTF had regarding its program requirements were the number of absences that a fellow was allowed. The policy capped unexcused absences to only two occasions.( interviewing for a teaching position was the only absence that was excused under the policy) Plaintiff missed not a single day of his pre-service training.

2) Plaintiff now believes that his unwarranted assignment into a Third Grade class that focused primarily on English skills was designed to purposefully belittle or otherwise impact plaintiffs self esteem. The inclusion of computers that had incessant problems and required constant attention to resolve was also purposefully  designed to frustrate plaintiffs ability to spend time teaching and upon information and belief, was intended to gain behavioral insights on plaintiffs responses.

3) There were three fire alarms during the period that plaintiff was assigned to x089, where, based upon conversations with people familiar with the school fire drill practices, only one would be normal during the summer months. Plaintiff, on the very last day before he was removed from the program, and while only a few minutes into his lesson while being observed from the second coach( in the last week of field experience, fellows are observed by a different coach to better balance feedback and fellow appraisal), was interrupted by someone in the hallway asking where the bathrooms were, and at the moment plaintiff responded, a fire alarm went off which precluded his lesson. Plaintiff contends that this interruption was no accident and was deliberately

designed to thwart plaintiffs efforts in the program. Furthermore, the timing and nature of the interruption were designed to have a psychological impact.

Plaintiff contends that these and other actions and experiences provide evidence that actors associated with plaintiff in space or time through the duration of his experience participating in the NYCTF program acted to deprive him of his constitutional rights as articulated above.

**State law Claims**

**I. First Claim-- Allegations of the Tort of INTENTIOHAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE through Civil Conspiracy**

1) The NYCTF program entailed the prospect of becoming a teacher upon completion of a short training program(7 weeks) with full teacher salary, benefits and protections along with a subsidized masters degree to be completed over two years at nights and weekend while teaching full time. The NYCTF placement rate of between 98~99% represented a virtual guarantee of employment after acceptance to the program. The

rate of involuntary removal, upon information and belief, was
vanishingly small, perhaps less than ½ of 1 percent.( less than 1 for
every 200 participants) These facts
demonstrate that there was a clear prospective economic benefit
through plaintiff's participation in the NYCTF program. To the
extent that employment was not "guaranteed" by the NYCTF
program because employment was ultimately determined by an
offer of employment by a particular NYC public school, then the
NYCTF can properly be considered a third party in relation to
plaintiff and  the prospective economic relationship he would
expect to have with a particular employing NYC public school.
2) The NYCTF was clearly aware of this prospective economic
benefit to participants in the program, and in fact trumpeted
these benefits in many forms and formats in order to win
candidates into the program.
3)As described in time facts above, intentional acts on the
part of third party defendants acting in conspiracy were
designed to disrupt this economic relationship. The intent was to
sabotage plaintiffs candidacy in the NYCTF program. These third
parties included other NYCTF participants, personnel at PS x089
in the Bronx, individuals associated with the Relay GSE and
others in the direct or indirect employ of the NYCTF program
and unnamed John Does.
4) This prospective economic relationship was infect disrupted
by way of plaintiff's involuntary removal from the NYCTF
program on 7/31/12, which was caused by third party defendant
actions.
5) Plaintiff has suffered severe economic, financial and
emotional hardship due to the actions of defendants. Plaintiff

has lost access to a subsidized master's degree, has lost

income that would have started at the rate of approximately

58,000 per year. Plaintiff has lost pension health and other

benefits associated with becoming a NYC Teacher. Plaintiff has

suffered emotionally in profound and deep ways.

**II. Second Clams" Breach of Contract**


A Breach of contract between plaintiff and the NYCTF was caused

by way of actions of the NYCTF or agents thereof.

1) Case law has recognized breach of contract claims even in at

will employment contexts. Defendants, the  NYCTF made numerous

representations and  "compacts" with participants in the NYCTF

program that established certain contractual relationships and

certain expectations regarding the performance of certain

duties and obligations between the parties during the "pre

service training" period of the NYCTF program as well as during

the entire fellowship period. One such document was entitled

the "Fellow Commitment form"(see exhibit d ).This form, which

was required to be signed by plaintiff as a condition of

participation in the program, clearly articulates

responsibilities and  duties of both parties to the agreement.

This form clearly articulates "benefits of the fellowship" that

are contingent on the various duties and obligations of the

parties.

2) Many of these duties and obligations required positive

assent (i.e. signatures) from the NYCTF fellows participating

in the program.

3) In addition, the statutes and regulations governing the NYCTF

program clearly established contractual elements between the

31

NYCTF program and participants, the breach of which, would warrant recovery under breach of Contract law.(See again exhibit c 52.21(b)(3)( xvii) of the commissioners regulations.)These regulations clearly describe the Introductory component, which articulated the requirements of the seven week "pre-service" training that plaintiff participated in. This "pre-service" training included three distinct components. ( see exhibit E from NYCT Fellow Advisory manual)

4)Implicit in the contract between the plaintiff and the NYCTF program was that the NYCTF program would abide by all NYS Department of Education regulations relating to the alternative teacher certification program.

5) The NYCTF program breached their contact with the plaintiff by way of denying to plaintiff statutorily required elements required to complete the "pre service" training period of the NYCTF program.

6) The NYCTF program violated * CRR-NY 52.21 of the Commissioners regulations by erroneously assigning plaintiff to a third grade reading class where his title being sought was a middle school math certificate. From the commissioner's regulations:

"The introductory' component. shall include.....*field experience appropriate to the certificate title sought* of at least 40 clock hours" (emphasis added)

Part 52.21 of the Commissioners Regulations states

" (vii)**Field Experience**   means direct observation of teaching, participation in teaching, or **teaching  itself that is related to the teacher education program in which the candidate is enrolled**; engaged in prior to student teaching or practice; and

32

carefully selected and  planned by program faculty,"(emphasis added)

7) This breach was clearly intentional and avoidable as ample opportunities to provide appropriate grade and subject level experience was available at X089, yet inexplicably denied to plaintiff. Plaintiff was sabotaged in his candidacy in the NYCTF program by way of defendants actions  Plaintiff was erroneously assigned to a third grade
class focused primarily on reading and where plaintiff was enrolled in a program to obtain a middle school math teaching certificate.

8) The NYCTF further breached their contractual obligations to plaintiff in failing to provide appropriate and statutorily prescribed mentoring:

Part 52.21 (b) (5) of the Commissioners Regulations reads:

<11) Teacher –**mentor shall mean an experienced and highly effective certified teacher who is employed in the same high need school as the candidate and who is assigned to provide mentoring and support to a candidate**( emphasis added)

9) NYCTF failed in its contractual responsibility by continuing to pair plaintiff with an excessed teacher who by definition, is a teacher considered not to be highly effective.

10) The violation of these contractual agreements was a contributing cause of plaintiff's removal from the NYCTF program.

11) Plaintiff has suffered the loss of potential future employment/retirement and  other benefits of  becoming a NYC teacher, including a subsidized Masters degree.

**III. Third Claim  Breach. of contract between plaintiff and Relay GSE**

1)Relay GSE, as a unique Graduate school of education that attains all of its students through various state alternative teacher certification programs( in other words, they have no students that are not participants in various alternative teacher routes, unlike the 7 other graduate education programs participating in the NYCTF), had an implicit obligation to follow the statutes and regulations governing alternative certification program.

2) Relay GSE also has a duty to abide by its own policies and procedures.

3) Relay GSE, in violation of both its internal policies regarding student acceptance as well as the NYS statutes governing' graduate schools of education in alternative certification programs, required plaintiff to provide an official undergraduate transcript where plaintiff had already provided an official graduate school transcript.

4) Relay GSE's own published and disseminated policy guidelines as well as the statutes governing these institutions clearly state that an official Graduate Transcript **or** an official Undergraduate transcript is sufficient evidence of obtaining a baccalaureate degree. Yet, even  after providing an official graduate degree transcript, Relay .demanded plaintiff produce official undergraduate transcripts.

5)In addition to violating contractual terms, statutes and Relay GSE own internal policies, this action was clearly discriminatory as plaintiff is aware of another relay student who was not required to similarly provide an undergraduate

34

transcript where she had not  yet provided one to relay. This
student did not face the threat of removal from the graduate
program despite being in a  similar circumstance. In addition,
this student was not  denied computer access as was plaintiff,
for not providing an official undergraduate transcript.
6) Plaintiff had to incur undue and unnecessary costs to obtain
these undergraduate documents that were more than 20 years old,
else be removed from the Relay graduate school (which would
have also resulted in the removal from the NYCTF program)
7) The actions taken by Relay above, evidence a breach of
contract and also evidence discriminatory conduct. In fact, Relay
intended to sabotage plaintiffs successful completion of the program by
their actions.
8)The actions of  Relay resulting in as breach of contract,
resulted in plaintiff incurring undue costs to obtain his
undergraduate transcript and also compromised his ability to
participate and perform Relay graduate education modules while
he was denied access to idea online education portal. These
actions, in breach of contact between plaintiff and Relay GSE,
also contributed to plaintiff's removal from the NYCTF program.
**IV. Fourth Claims Breach of the Covenant of Good Faith and Fair**
**Dealing by NYCTF and Relay GSE**


The contractual elements that existed. between plaintiff and
NYCTF as well as plaintiff and Relay GSE agreement has implied
in law a covenant of good faith and fair dealing by which
defendant promised to give full cooperation to plaintiff in his
performance under the implied contact and contractual elements,
as is the case with the NYCTF, and with an actual contract as

well as implied contractual expectations, arising from the NYS
statutes under which Relay GSE was obligated to observe.
The actions in the above two causes of action clearly
demonstrate a Breach of the Covenant of Good Faith and Fair
dealing in that not only was full cooperation denied to
plaintiff in his  performance, plaintiff was actively thwarted
in his ability to perform in various capacities while in the
NYCTF program.

1) Relay GSE, by requiring the production of official
undergraduate transcripts where other students at Relay in
similar circumstances were not, acted in both a discriminatory
manner and in violation of rule and statute. The relay student
hand book clearly indicates that as graduate degree **or**
undergraduate degree was sufficient for admission. ( see
exhibit A ). The commissioner's regulations also have the same
language regarding the acceptable qualifications of students
intending to enroll in alternative certification teacher
education programs.( see exhibit C under Admission Requirements
)

2) Removing plaintiff from the online course platform
considerably disadvantaged plaintiff in the performance of his
duties.

3) Upon information and belief, plaintiff's field experience
coach, Marisol Alicia Ferguson, may have been associated with
Relay' GSE, as the commissioner's regulations imply that the
enrolling graduate school of education is responsible for the
field experience supervision of fellows. If so, then the
actions taken by Marisol that worked to deny plaintiff
appropriate field experience and otherwise denied plaintiff an

36

opportunity to demonstrate his fitness and competence, extends to Relay as well.

4) In any event, Marisol Alicia Ferguson was acting in the capacity of student coach for the NYCTF, and her actions were clearly in violation of the covenant of good faith and fair dealing by :

5) Repeatedly' denying' plaintiff an opportunity to teach  a subject and grade appropriate class.


6) Admonishing plaintiff against activities clearly allowed and expected of teaching fellows(for example, taking 30 minutes to interfere and admonish plaintiff while he was preparing a lesson in the common teacher lesson preparation room. It is noteworthy that Marisol decided that admonishing plaintiff was more important than attending her scheduled debriefing with another fellow scheduled at that time. She missed the scheduled debriefing with this other fellow.

7) Admonishing plaintiff for attempting to arrange a time to teach in Nicole Hill's middle school grade level class, where Marisol requested that plaintiff attempt to contact Nicole Hill to arrange a time to teach in her class. It is as if Marisol intended to create the (false) appearance of wanting to assist plaintiff in his teaching development, while simultaneously acting to thwart this  development in fact, action and intention.

8) Acted to control plaintiffs activities in PS x089 by insisting plaintiff he in his classroom. 100% of the time students were present, a request that was inconsistent with general practice and the field experience manual.

9) As a result of the actions of Marisol Alicia Ferguson and others at x089 and the NYCTF program, plaintiff has been deprived of the benefits of the express and implied agreements entailed in various NYCTF communications regarding what he would rationally expect throughout the pre — service training period.

10) These benefits included the simple expectation that plaintiff's development as a "teacher would be promoted and encouraged, rather than thwarted and discouraged.

11)Relay also violated the covenant of good faith and fair dealing by denying him the opportunity to resubmit or make up course modules that were interrupted and otherwise adversely affected by being removed from the on line course computer platform. In addition, Relay appeared to provide other students with more opportunity to correct, resubmit or otherwise obtain more favorable treatment in grading on numerous occasions.

**V.Fifth — Claim**


**Violation of New York State and City Human Rights Laws, 13.1'.**

**Exec. Law § 296(1)(a), N.Y.C. Admin. Code § 8-107(1)(a).**

1) The NYCTF violated the NYS and City human Rights laws by way of age and disability discrimination:

2) Plaintiff was clearly qualified to be a NYC teacher as he passed with very high grades both the LAST with a score of 280 out of 300 and passed the CST 004 mathematics exam with high grades on the first attempt. Plaintiff also has 180 college credits, an MBA in Finance and Investments with a 3.84 GPA as well as prestigious financial industry designations.

3) Plaintiff was the age of 48 at the time of his acceptance into

the NYCTF program. Upon information and belief, plaintiff was the only Fellow at X089 over 40 years of age.

4) Plaintiff was denied age and subject appropriate "field experience" where such field experience was not denied any other math fellows at his school (x089) and where all other math fellows were significantly younger( between 20 and 30 years of age)

5) Plaintiff was denied teaching a particular middle school grade level math program at x089 and where the teaching assignment was given to a science fellow( biology) who was in her early 20's.

6) Plaintiffs cooperating teacher (this is the teacher who is the primary teacher in a given class that the teaching fellow is assigned to) was excessed a mere two weeks into the field experience. Plaintiffs cooperating teacher was in her 50's, upon information and belief. This teacher complained that the Principal wanted to eliminate the more costly older teachers to make way for the generally younger teaching fellows.

7) Plaintiff was the only fellow to be paired with an excessed teacher at x089 and upon information and belief, he may have been the only fellow out of the 900 member co-~hort in this position.

8) Plaintiff was removed involuntarily from the NYCTF program a mere two days before he would have earned his "conditional teaching certificate" and before he would have been under the "protection" of the UFT.

**Disability discrimination**

1) Plaintiff has had bowel issues for a number of years and occasionally requires the use of a bathroom.

2) Plaintiff's coach at x089 made an issue of using the bathroom and at one point stated that plaintiff could not use the bathroom while classes were in session, and was required to remain in the classroom 100% of the time while students were present. This demand clearly violated the description of field experience in the field experience manual, where teachers were encouraged to use their time in a  number of teacher enriching activities. These activities included lesson development and observing other teachers in other classrooms ....... both activities that take place outside the cooperating teacher's classroom.

3) Plaintiff acceded to defendants unreasonable demands by changing his diet and otherwise avoiding the use of the bathroom during class session, to his discomfort and in violation of anti discrimination statutes.

4) Despite acceding to unreasonable demands that violated basic notions of decency and fairness and which in light of plaintiffs condition, violate the  most reasonable concepts of accommodation, plaintiff was terminated from time NYCTF program a mere two days before the completion. of the pre service component.

**VI. Sixth Claim**

**Libel**

Plaintiff has reason to believe that libelous statements were made and communicated by x689 personnel to other individuals of the NYCTF program that defamed plaintiff and were a proximate cause of his removal from the program.

1) As was described in previous causes of action, plaintiff was repeatedly thwarted from teaching an age and grade appropriate class despite the insincere appearance that the

NYCTF wanted to provide this experience.

2) The day plaintiff was scheduled to  co-teach a 7th  grade
math class in Ms Hills class with NYCTF fellow Jacob Sugar: a)
Jacob called in ill that morning. b} In response, plaintiff
prepared that morning to teach the entire class himself,
assuming Jacob would not be teaching his part of the class c)
at the last moment and without forewarning, plaintiff was told
that his lesson was preempted by a music performance scheduled
for that class d) Plaintiff was compelled to be observed that
very same day and  time teaching his  original class without
the benefit of having a lesson prepared.

3) Plaintiff approached Ms. Hill at some point after this to
discuss the matter, and Ms. Hill appeared to agree with
plaintiff that his observation should be rescheduled in her
class. Plaintiff was respectful and professional in all
communications and at all times.

4) Marisol suggested that plaintiff try to arrange another
day to teach in Ms. Hills class. Despite this invitation, both
Marisol and Ms. Hill acted to repeatedly thwart such an
arrangement.

5) After plaintiff patiently waited over an hour in the
principal's office to arrange a time to teach in Ms Hills class
(Ms. Hill was in a meeting with X089 principals), an assistant
principal came out and provided plaintiff with a day and time
to teach in her class. Plaintiff was respectful and
professional in all communications.

6) Sometime following this rescheduling to teach in Ms Hills
class, Marisol Alicia Ferguson sent out  e-mail that expressed
dissatisfaction with the "tone" of plaintiff's interaction with

41

Ms. Hill. Marisol expressed that she had been in contact with other NYCTF personnel regarding this matter.

7) Plaintiff was later told he would not be teaching in Ms. Hill's class after all. Plaintiff contends that this was the desired outcome from the start.

8) The circumstances suggest libelous communications regarding plaintiffs character, manner and professionalism that has defamed him in fact and has  resulted in plaintiffs removal from the NYCTF program.

**VII. Seventh Claim**

**Intentional Infliction of Emotional Distress**

Plaintiff avers that  a conspiracy involving individuals and entities associated with the NYCTF program, Relay GSE and x089, and unnamed John Doe's, while plaintiff was involved in the NYCTF program, acted in conspiracy to deny plaintiff the ability to  successfully complete the NYCTF program and that this conspiracy was done with the intention to cause emotional distress.

1) Plaintiff avers that it was never the intention of the NYCTF program to allow plaintiff to successfully complete the program. In fact, as earlier causes of action make clear, there were numerous actions taken by individuals to thwart plaintiff at various stages of the program.

2) Acting in conspiracy to deny plaintiff gainful employment and the completion of the program, while fraudulently inducing plaintiff to wrongly believe that he had a full and fair opportunity to obtain the desired benefits, is extreme and outrageous conduct. Such action can only be described as

42

heinous and beyond all bounds of decency.

3) Falsely misrepresenting their true intentions and intending to cause plaintiff to be removed from the NYYCTF program, demonstrates the intent to cause severe emotional distress.

4) In fact, defendants have caused plaintiff to be removed from the NYCTF program and have caused plaintiff severe emotional distress. Plaintiff has been affected in deep and profound ways that are often difficult to articulate. He has become unduly distrustful and suspicious. The activities of life that most take for granted have become arduous and difficult for him.

5) Plaintiff avers that there was an express or tacit agreement between defendants to cause him not complete the NYCTF program and to suffer severe emotional distress.

6) The wrongful acts committed in the furtherance of this goal include the making of libelous statements regarding the plaintiff, fraudulent misrepresentation, as there was never any intention to allow plaintiff to complete the program, the taking of actions to thwart various contractual obligations, and the violation of statutory requirements of the NYCTF program.

7) Some additional facts demonstrating the intention to inflict psychological harm include the following:

On the very last day of plaintiffs employment, while being observed for the first time by the "alternative coach"(the last week of the field experience, the fellows are observed by a second coach, and this is intended to give a more objective and balanced determination of fellow development) a woman walking in the hallway interrupts his lesson, asking him where the

bathroom was, and exactly at that moment, when plaintiff responds to her, fire alarms go off, interrupting plaintiff at the very beginning of his lesson. This was the final interruption, as plaintiff was removed from the program the very next day. It is noteworthy that this was the third fire alarm in a short three week time frame, where upon information and belief, normally there is only one fire alarm drill in the full summer session at this school. Plaintiff avers that this and other highly unusual occurrences were coordinated, deliberate and intentional.

**VIII. Eighth Cause**

**Retaliation and wrongful discharge in violation of Public Policy**

1) Plaintiff asserts that the NYCTF program had a motive to remove him after he complained of the waiver conditions embedded in Relay GSE admission acceptance document. The language in this document ( exhibit. A) clearly violates the FERPA laws as students in the Relay GSE program waive their right to the use of videos made of their class presentations.

2)Video recordings are a crucial element in the  Relay grading process, and as  such, constitute educational records under the FERPA statutes.

3)Waiver of FERPA rights as a condition of acceptance into the Relay GSE program was unacceptable to plaintiff and he made his concerns known both to relay and the NYCTF.

4)Relay made two revisions in the language of the acceptance document, the second of which plaintiff accepted.

44

5)Notwithstanding inns apparent ability "opt out" of this waiver, it is plaintiffs contention, that his decision to opt out was undesirable, and that the NYCTF as well as Relay GSE ,as a pioneering Graduate School of Education, wanted to avoid having to do this with other students to the greatest degree possible.

6) The protection of legal rights in the employment context is clearly in the public interest. Violations of FERPA laws are routinely understood as issues that concern the general public health and safety.

7) Plaintiff made his concerns known to supervisors who were able to address the policy in question.

8) Plaintiff was retaliated against for making this violation of FERPA rights known by being removed from the NYCTF program.

9) Plaintiff has suffered economically and emotionally as a result of being removed wrongly from the NYCTF program, in contravention to the public interest.


**Ninth Claim**

**X. Civil Conspiracy**

Plaintiff avers that each and every cause of action enumerated above has been accompanied by a conspiracy of action to achieve the wrongs claimed.

Each cause of action enumerated above involves an agreement between at least two individual defendants, the commission of a wrongful act pursuant to the agreement, and damage resulting to the plaintiff as a result of the conspiracy.

**INJURIES**

As stated. above, plaintiff' has suffered the loss of future

45

income, retirement benefits, educational and other benefits by
being removed from the NYCTF program. In addition, the
plaintiff has been denied other opportunities that may have
been forgone by participating in this program. In addition, the
plaintiff has suffered severe emotional distress and  has been
affected in his life in deep and profound ways.

**Relief,**

The plaintiff requests the sum of  Three million Dollars as
compensation/treble damages for lost income and benefits for
being denied a career as a NYC teacher through the NYCTF
program and punitive damages owing to the intentional and
deliberate acts described above which have resulted in severe
harm to plaintiff.

I Declare under penalty of perjury that the foregoing is true
and correct,

signed the   6TH day of  February    2014

Steve Loren Pro se

46-28 218"*Street

Bayside, NY 11361

718~819~O732

# Exhibit A

RELAY/ 

# CLASS OF 2014 ADMISSIONS AGREEMENT

This agreement ("Agreement") is made between the accepted graduate student named below ("Graduate Student") and Relay Graduate School of Education ("Relay"). The Graduate Student and Relay, by entering into this Agreement, acknowledge the terms detailed in this document and the Graduate Student's responsibilities.

## ENTRANCE REQUIREMENTS

☐ **Employment.** The Graduate Student must secure and maintain a teaching position at a school. The Graduate Student must make every reasonable effort to work with a consistent group of students throughout the academic year.

☐ **Deposit Fee.** The Graduate Student is responsible for the timely payment of any deposit fee. The Graduate Student or his or her sponsoring organization will pay the $230 deposit fee by the prescribed deadline. More information about this deposit fee, including how and when to pay it, will be shared in the coming days.

☐ **Immunizations.** The Graduate Student will submit the completed Relay Immunization Form with the proper immunizations records no later than September 1, 2012, to be compliant with New York State's Public Health Laws #2165 (measles, mumps, and rubella) and 2167 (meningococcal disease).

☐ **Transitional B Certification.** The Graduate Student will complete all the New York State Transitional B prerequisites by September 1, 2012. The prerequisites include without limitation passing the appropriate certification tests, completing the Child Abuse Prevention and School Violence Intervention workshops, and applying for his or her Transitional B certificate.

## EXPECTATIONS OF GRADUATE STUDENTS

To maintain enrollment in Relay, the Graduate Student must adhere to the expectations listed below.

☐ **Academic Progress.** The Graduate Student will maintain satisfactory academic progress, as outlined in the Relay Student Handbook.

☐ **Tuition & Fees.** The Graduate Student will comply with all billing policies outlined in the Relay Student Handbook. The Graduate Student understands that he or she is responsible for paying the full balance of tuition and fees that have been charged each to him or her, including any deferred tuition. The Graduate Student understands that if he or she is dropped or withdraws from the program for any reason before the full balance of any deferred tuition has been paid, this balance will no longer be deferred and will become payable immediately. The Graduate Student understands he or she will be responsible for paying the balance of any unpaid tuition or fees intended to be paid by a third party.

☐ **Classroom Observations.** The Graduate Student consents to both Relay faculty and partner school personnel regularly observing and providing feedback on his or her classroom teaching throughout the year.

☐ **Student Achievement Data.** The Graduate Student will work with his or her school to provide Relay with his or her student assessment data (e.g., school-based interim assessments, state test data, and/or national exams).

☐ **Videotaping in the Classroom.** The Graduate Student will follow his or her school's protocol for obtaining parental permission to videotape in the classroom at the beginning of the academic year to ensure assignments can be completed in a timely manner.

## MEDIA RELEASE

In order to share with educators, the media, contributors, and others who are interested in watching class sessions and learning more about Relay, Relay will record and describe through audio, video, photography, print, and other means ("Recordings") class sessions and other official program activities related to Relay and may broadcast, publish,

or post all or part of such Recordings for educational purposes. In addition to Recordings made by or on behalf of Relay, interviewers, photographers and reporters from the news media, non-profit organizations and others may, with the authorization of Relay, create Recordings.

For consideration which the Graduate Student acknowledges, the Graduate Student hereby consents to the broadcasting, publishing, or posting of Recordings, and hereby grant any rights in connection with the use of such Recordings, which may include but not be limited to my name, image, likeness, spoken words, teacher work (including any copyright(s) therein), performance, and movement, in any and all forms of media for educational purposes. The Graduate Student further hereby consents to the use of my biographical information and affiliation with Relay, its activities, and/or programs.

The Graduate Student acknowledges and understands that he or she has no control over how Relay or others authorized by Relay will use the Recordings or how such Recordings will be edited or how the Graduate Student will be portrayed. The Graduate Student waives any right to inspect or approve Recordings that may be used now or in the future, whether that use is known to him or her or unknown, and the Graduate Student waives any right to royalties or other compensation arising from or related to the use of the Recordings.

The Graduate Student acknowledges and understands that Relay and others authorized by Relay that made such Recordings shall own all rights, title and interest, including the copyright(s), and the Graduate Student hereby irrevocably grants and assigns all such rights he or she may have, in and to the Recordings, to be used and disposed in perpetuity without limitations and such organization that created such Recordings shall determine such use in its sole discretion.

By entering into this informed consent and release and granting the permission as stated herein, the Graduate Student releases Relay and others authorized by Relay and each organization's or authorized person's respective affiliates, officers, directors, agents, assigns, licensees, successors, and/or employees from and against any and all liability, loss, damage, costs, claims (including but not limited to claims for invasion of privacy or defamation), and/or causes of action arising out of or related to my participation in any media events, including but not limited to, television broadcasts, promotional materials, or website projects.

The Graduate Student acknowledges and understands that he or she consents to the creation of the Recordings for the entire period during which he or she is enrolled at Relay, employed or otherwise affiliated with Relay, and that Relay and others authorized by Relay that made such Recordings have the right to use the Recordings in perpetuity without limitations.

## REPORTING

Relay is granted authorization throughout the Graduate Student's enrollment at Relay to provide regular reports on his or her academic performance and conduct in the graduate program to a designated representative of the school which employees the Graduate Student, an educational program for which the Graduate Student performs services, the teacher preparation program in which the Graduate Student is a participant, and any entity that funds the Graduate Student's Relay education.

These reports may include without limitation the Graduate Student's academic progress, grades and evaluations, completion of degree requirements, timeliness of tuition and fee payment, disciplinary actions, and continued enrollment status. Relay is authorized to determine in its sole discretion the schedule for providing this information and the information to be provided at the time.

The Graduate Student's execution of this Admissions Agreement will serve as his or her written authorization under applicable state and federal law, including FERPA, for the regular release of these educational and related records to the category of entities identified herein throughout my Relay enrollment.

# Exhibit B

If a graduate student does not specifically request the withholding of directory information by filing the Directory Information Non-disclosure Form, Relay GSE assumes that he approves of the disclosure of such information.  The University disclaims any and all liability for inadvertent disclosure of directory information designated to be withheld.

EDUCATION RECORDS

"Education records" available for review are defined as those records, files, documents, and other materials that contain information directly related to a graduate student and that are maintained by Relay GSE.  The form in which the information is maintained by Relay GSE does not matter; for example, computerized or electronic files, audio or video tape, photographic images, film, etc., with such information are "education records".  This includes communications and documents distributed or received by e-mail, or other similar Relay GSE systems, which are retained in these systems, either by the sending or receiving party.  In general, the records maintained by Relay GSE that are available for graduate students' review are records pertaining to admissions, academic performance, advising, financial aid, and billing.  Graduate students have the right to review original documents from their files.

Under FERPA and its related regulations the following types of Relay GSE records are not "education records" and are, therefore, not available for graduate student review:

1.  Personal notes or records (including computerized files) that are kept by an individual University employee solely in her or his possession, are used only as a personal memory aid, and are not accessible or revealed to others, except to a temporary substitute.
2.  Records that relate to an individual who is employed by Relay GSE and that (a) are made and maintained in the normal course of business, (b) are not available for use for any other purpose, and (c) relate exclusively to the individual in that individual's capacity as an employee. This exception does not apply to records that relate to a graduate student in attendance at Relay GSE who is employed as a result of his/her status as a graduate student.
3.  Medical and psychiatric records created, maintained, and used only in connection with the treatment of a graduate student and that are not available to anyone other than the persons providing such treatment. Such records can be personally reviewed by a physician, psychologist, or other appropriate health professional of the graduate student's choice.
4.  Records that contain information relating to an individual who no longer is a graduate student at Relay GSE and that are not directly related to the individual's attendance as a graduate student, i.e., alumni records.
5.  Grades or peer-graded papers before they are collected and recorded by a faculty member.

RELEASE OF EDUCATION RECORDS

Relay GSE maintains it will not release student records without a printed and signed request from the graduate student. Graduate students may download the Relay GSE Education Record Release Authorization Form on the Minerva "Enrollment Services Form" section. Completed forms must be submitted to the Office of Enrollment Services.  Upon receipt of the signed form, Relay GSE will release the appropriate student records within two weeks.

To this end, Relay GSE will provide any graduate student with a copy of his education records upon written request.  This information may also be furnished to agencies or individuals authorized by law to review such records.

# Exhibit C

OCUE Home            $E \times \mu i \beta i t$     C

# Part 52.21(b)(3) of Commissioner's Regulations

## 52.21(b)(3)(xvii) Alternative teacher certification program.

a. **General requirements.**

1. The general requirements in subparagraphs (b)(2)(i), (ii) and (iv) of this section shall be applicable. The other requirements of paragraph (2) of this subdivision shall not be applicable. The program shall require candidates to have acquired the knowledge, understanding, and skills identified for the general education core in the liberal arts and sciences and the content core for the initial certificate in the area of the transitional B certificate, as set forth in subparagraph (b)(2)(ii) of this section, or to complete study to ensure the acquisition of such knowledge, understanding, and skills before completing the program.

2. Programs registered on or after July 1, 2001 shall meet all requirements of this subparagraph. Programs registered prior to July 1, 2001 shall meet the requirements in effect at the time of registration. For registration to continue beyond August 31, 2002, programs shall demonstrate compliance with all the requirements of this subparagraph.

3. The program may permit a candidate to meet a portion of coursework requirements in the introductory and/or in-service components of the program through assessment methods used by the program that shall ensure that the candidate has the knowledge, understanding, and skills that would be acquired through such coursework. Methods of assessment may include, but need not be limited to, determination of equivalency of prior study, testing, portfolio reviews, and demonstration of knowledge, understanding, and skills.

4. In lieu of offering an introductory component, the program may admit candidates who meet all admission requirements of this subparagraph (xvii) on the condition that they receive a transitional B certificate issued by the department based on having completed equivalent study to that required for the introductory component in this subparagraph (xvii), as determined by the department, and having met any other requirements for such certificate, as prescribed in section 80-5.13 of this Title. The candidate shall present satisfactory evidence of holding the transitional B certificate prior to the commencement of mentored teaching in the in-service component.

b. **The program shall meet the requirements in each of the following subclauses:**

1. **Admission requirements.**

   Alternative teacher certification programs that are registered prior to July 1, 2001 shall meet the admission requirements in effect at the time of registration or the admission requirements of this subclause. All alternative teacher certification programs that are registered on or after July 1, 2001 shall meet the admission requirements of this subclause.

   i. As used in this subclause, major means sequential study comprising at least 30 semester hours that provides knowledge of breadth and depth in an interdisciplinary field or a subject, provided that such 30 semester hours may include up to 12 semester hours in cognates. The program shall evaluate the preparation of candidates to determine whether they have a sufficient knowledge base to teach to the State Learning Standards appropriate to the certificate sought and shall require candidates to complete additional study, if necessary, to address deficiencies prior to completion of the program.

   ii. The program shall require candidates to hold a baccalaureate or graduate degree from a regionally accredited institution of higher education or from an institution authorized by the Board of Regents to confer degrees. Candidates shall have achieved a 3.0 cumulative grade point average, or its equivalent, in the program leading to the baccalaureate or graduate degree, or shall have been found by an officer designated by the registered alternative teacher certification program to have the necessary knowledge and skills to successfully complete the program, which finding shall be in writing and include the basis for that finding.

   iii. Candidates for a certificate in the classroom teaching service shall have completed an undergraduate or graduate major in the subject of the certificate sought, or an undergraduate or graduate major in a related field approved by the department for this purpose at the time of program registration, except that candidates for a certificate in early childhood education, childhood education, and middle childhood education-generalist, or special education at those

Alternative Teacher Certification Program: Amendment to the Regulatio...          http://www.highered.nysed.gov/ocue/Part5221b3.htm

developmental levels, or in teaching common branch subjects in the lower (PreK-3) and upper (4-6) elementary grades (PreK-6)shall meet the requirements of item (iv) of this subclause.

iv. Candidates for certificates in early childhood education, childhood education, and middle childhood education-generalist, or special education at those developmental levels, or in teaching common branch subjects in the lower (PreK-3) and upper (4-6) elementary grades (PreK-6) shall have completed an undergraduate or graduate major in a liberal arts and sciences subject or interdisciplinary field.

## 2. Introductory component.

i. The introductory component shall lead to the transitional B certificate in a certificate title in the classroom teaching service, and may also lead to a bilingual education extension of such transitional B certificate. It shall be offered by faculty employed by the institution offering the registered program and may include other instructors approved by the institution offering the registered program, such as school district personnel or other educational providers.

ii. Except as provided in item (iii) of this subclause, the introductory component shall include pedagogical core study of at least 200 clock hours, including field experience appropriate to the certificate title sought of at least 40 clock hours under the supervision of a certified teacher.

iii. A program leading to a transitional B certificate authorizing the teaching of English to speakers of other languages, students with disabilities, students who are deaf or hard-of-hearing, students who are blind or visually impaired, or students with speech and language disabilities, which may also lead to a bilingual education extension of one of those certificates, shall meet the clock hour and field experience requirements as prescribed in item (ii) of this subclause or the following requirements: pedagogical core study of at least 100 clock hours, including field experience appropriate to the certificate title sought of at least 40 clock hours under the supervision of a certified teacher, provided that the program only places such students in grades seven though twelve, if authorized by the certificate, arranges for at least a 25 percent reduced teaching load during the first semester of teaching, and requires the candidate to complete all of the remaining pedagogical study of the introductory component prescribed in item (ii) of this subclause by the end of the first semester of teaching in the in-service component of the program.

iv. The introductory component shall include, but shall not be limited to, undergraduate or graduate study designed to permit the candidate to obtain the following pedagogical knowledge, understanding, and skills:

   A. introduction to the community in which the school or school district is located and the learning needs of students in that community, including field experiences within the community that provide interactions with community leaders and residents;

   B. historical, social, and legal foundations of education, including special education, the education of students with limited English proficiency, and multicultural education;

   C. rights and responsibilities of teachers and other professional staff, students, parents, community members, school administrators, and others with regard to education;

   D. child or adolescent development, as appropriate to the certificate sought, including the processes of first and second language acquisition and the characteristics of learners with disabilities;

   E. instructional planning and effective teaching strategies, including the use of technology, for assisting all students, including native English speakers, English language learners, and students with disabilities, to achieve the State Learning Standards in English language arts and the subject(s) appropriate to the certificate;

   F. school organization and classroom management, including methods of managing behavior of students with disabilities and promoting development of positive social interaction skills in all students;

   G. means for identifying and reporting suspected child abuse and maltreatment, which shall include at least two clock hours of coursework or training regarding the identification and reporting of suspected child abuse or maltreatment, in accordance with the requirements of section 3004 of the Education Law;

   H. means of instructing students for the purpose of preventing child abduction, in accordance with Education Law section 803-a; preventing alcohol, tobacco and other drug abuse, in accordance with Education



Law section 804; providing safety education, in accordance with Education Law section 806; and providing instruction in fire and arson prevention, in accordance with Education Law section 808;

l. means for the prevention of and intervention in school violence, in accordance with section 3004 of the Education Law. This study shall be composed of at least two clock hours of course work or training that includes, but is not limited to, study in the warning signs within a developmental and social context that relate to violence and other troubling behaviors in children; the statutes, regulations and policies relating to a safe nonviolent school climate; effective classroom management techniques and other academic supports that promote a nonviolent school climate and enhance learning; the integration of social and problem solving skill development for students within the regular curriculum; intervention techniques designed to address a school violence situation; and how to participate in an effective school/community referral process for students exhibiting violent behavior.

3. **In-service component.**

For programs of undergraduate study, completion of the introductory component or its equivalent and the in-service component shall prepare the candidate with the education required for the provisional or initial certificate in a certificate title in the classroom teaching service and may prepare the candidate with the education required for a bilingual education extension of such certificate. For programs leading to a master's or higher degree, completion of the introductory component or its equivalent and the in-service component shall prepare the candidate with the education required for the provisional/permanent certificates or the initial/professional certificates in a certificate title in the classroom teaching service and may prepare the candidate with the education required for a bilingual education extension of such certificates. The in-service component of the program shall meet the following requirements:

i. Candidates must meet program standards for good academic progress for all credit-bearing coursework in order to retain the transitional B certificate.

ii. Mentored teaching. The program shall require program candidates who are teaching with a transitional B certificate to receive mentoring and supervision during the entire period that they are both teaching and enrolled in the program, including at least one school year, as follows:

A. The mentored teaching shall take place in a school or school district that offers instruction in any grade, pre-kindergarten through 12, as appropriate to the certificate sought.

B. Prior to the candidate's employment as a teacher, the institution shall execute a written agreement with the employing school or school district by which the school or school district agrees to consult with program faculty and the candidate before determining the teaching load of the candidate; agrees to provide daily mentoring of the candidate by certified school personnel during the first eight weeks of teaching; and agrees to execute, before the end of the first eight weeks of teaching, a second written agreement for continued mentoring by certified school personnel during the remainder of the time that the candidate is enrolled in the program and teaching;

C. The first written agreement shall indicate that all mentoring will be provided by certified school personnel who have received preparation for their role as mentors prior to serving as mentors, and shall include scheduled times during the candidate's first eight weeks of teaching for the candidate and mentor to engage in planning, observation, advisement, and evaluation;

D. The second written agreement shall include a schedule for continued mentoring during the remainder of the time that the candidate is enrolled in the program and teaching and shall be designed to meet the individual learning needs of the candidate. The agreement shall be signed by the principal or designee, program faculty, the mentor, and the candidate before the end of the first eight weeks of teaching. It shall specify times, periodically throughout each school year, for the candidate and mentor to engage in planning, observation, advisement, and evaluation; and shall also specify dates for meetings of program faculty, the school principal or designee, the mentor, and the candidate at least once every three months during the first year of mentored teaching and periodically thereafter, to provide the candidate with advice for improving teaching practices;

E. The second written agreement for continued mentoring and supervision may be modified to reflect changing learning needs of the candidate by

Case 1:13-cv-07597-VEC   Document 7   Filed 02/06/14   Page 56 of 61

Alternative Teacher Certification Program...Case 1:13-cv-07597...Attr Regulation...Document 2    Filed 10/25/13...Page 46 of 50...nysed.gov/ocue/Part5221b3.htm

agreement of and with the signatures of the principal or designee, program faculty, the mentor, and the candidate;

    F.  Program faculty shall supervise the teaching of the candidate and promote the linking of theory and practice by observing and advising the candidate at least once each month during the first year of mentored teaching and periodically throughout the remainder of the time that the candidate is enrolled in the program and teaching.

    iii.  Coursework requirement. During the in-service component, the candidate shall satisfactorily complete credit-bearing courses and seminars that are designed to link educational theory with classroom experience. The introductory component or its equivalent and the in-service component of the program in combination shall include the pedagogical core study as set forth in subdivision (b) of this section for the initial certificate in the area of the candidate's transitional B certificate and, as applicable, for the bilingual education extension of such certificate, except that the field experience, student teaching, or practica requirement shall not be applicable.

4.  A designated officer of the institution offering the registered program shall be required to recommend the candidate for the initial or provisional certificate or the initial/professional or provisional/permanent certificates, after consultation with the school principal or designee at the location of the mentored teaching.

5.  Successful completion of the program shall result in the award of a degree or the award of a certificate signifying program completion, as defined in subdivision 50.1(j) of this Title.

[ SED Home | OHE Home | OCUE Home | Contact Us | Feedback ]

Rev. 1/03

# Exhibit D

E x μ β ι τ "10"

New York City Teaching Fellows: Fellows Commitment Form          https://www.nycteachingfellows.org/enrollment/accept_0

**NYC TEACHING FELLOWS**

MY NYCTF: Log in to MY NYCTF here
Search: _____
Go

Contact    Job Search     Commitment    Fellow
Information  Preferences    Survey       Commitment     Comments

Fellows Commitment Form                                    Technical Issues or Suggestions

Before completing the enrollment process, you must certify that you understand and agree to the following statements. Please read them carefully before checking the box, signing your name, and providing today's date at the bottom of the page.

I am dedicated to working to ensure that New York City's students achieve. I will strive constantly to meet the needs of my students and do my best to aid the community in which I work. I realize that, as a NYC Teaching Fellow, I have made a commitment to work as an individual and as part of a cohort of Fellows to make a positive impact on student achievement in New York City schools.

I understand that the Fellowship's mission is to make a significant impact on student achievement, especially in the highest-need boroughs, schools, and subjects, and I am prepared to teach wherever I am needed most.

I understand that in order to remain a Teaching Fellow with the corresponding benefits of the Fellowship, I must maintain good standing in the following areas:

  • As a participant in pre-service training, through successful completion, as determined by the NYC Teaching Fellows program.

  • As an employee of the New York City Department of Education.

  • As a student, as determined by the institution of higher education in which I am enrolled.

  • As a Fellow, by passing all necessary teacher certification exams in my certification area (LAST and CST) before the beginning of the 2012-2013 school year.

  • As a Fellow, by maintaining professional conduct becoming of a student and a teacher.

I understand and agree that I may be filmed in the classroom during pre-service training and the videos will be uploaded to a secure online platform where they will be reviewed by the NYC Teaching Fellows program to provide me feedback on my performance in the classroom.

I understand that if I do not secure a full-time, appointed teaching position by the start of the school year that, in order to remain in the Fellowship, I must continue in an extended pre-service training program including coursework and student teaching.

I understand that I must secure a full-time, appointed teaching position in a NYC Department of Education public school and be placed on payroll by January 10, 2013 in order to remain in the Fellowship, and, if I do not secure such a position by that date, I will be removed from the Fellowship.

I agree to be responsible for and to pay $6,600 of the tuition costs of my master's degree. I understand and agree that this amount will be deducted from my regular pay in approximately 44 installments commencing in October of 2012 or, if I obtain a teaching position after that date, in February 2013.  I agree

New York City Teaching Fellows: Fellows Commitment Form                    https://www.nycteachingfellows.org/enrollment/accept_07.asp

to complete all necessary paperwork to authorize the payroll deduction.

I understand that, if I withdraw from the Fellowship at any time after I have begun training, I will not be eligible to reapply or reinstate in the future.

I agree to abide by all other policies, expectations, and procedures of the New York City Department of Education and the NYC Teaching Fellows program.

**If, after reading the terms of the fellowship, you choose not to accept, you may start the declination process by clicking here.**

☐ By checking this box and signing my name, I certify that I am the person who has been accepted to the program, and I have read, completely understand, and agree to the statements listed above.

Signature:                                          Please type your name here.

Date: 5/10/2012

`<< Back`                                    Technical Issues or Suggestions

**ATTENTION!**
By clicking the button below you will submit your completed Enrollment forms. After submitting, you will not be able to make changes to the forms you have completed. Do not click on this button until you have completely and accurately filled out the preceding materials and are ready to finalize your submission.

Click to submit your completed
enrollment survey

Copyright � 2002-2012 NYC Teaching Fellows. All rights reserved.��|��Contact

5/10/12 1:11 PM

# Exhibit E

## Introduction

The heart of your training experience as an NYC Teaching Fellow is the seven-week pre-service training program designed to produce teachers who will assured an effective teacher who has the skills, traits and techniques to significantly raise student achievement within NYC classrooms.  Pre-service training is comprised of three primary components aimed at promoting mastery of the Key Components:

- *Fellow Advisory sessions*: In Fellow Advisory sessions, you will observe model *Teach Like a Champion* techniques aligned to the Key Components as demonstrated by Fellow Advisors or videos; analyze how to effectively apply the techniques; and rehearse the techniques with peers before practicing them with students, receiving real-time feedback.

- *Field Experience*: In pairs with a peer, you will spend four weeks in a NYC summer school classroom. You will gradually take on more teaching time from the first week of Field Experience and use Field Experience as an opportunity to demonstrate the Key Components in a realistic setting. Coaches will observe you at least twice per week and you will be expected to implement feedback immediately.

- *Responsive Coaching Sessions*: Coaches will coach small, flexible groups of you and your peers on specific skills and *Teach Like a Champion* techniques that you need to improve in your field experience classrooms.

This manual provides you with detailed information about the Fellow Advisory sessions. Please bring this manual and your copy of *Teach Like a Champion*, which you will read prior to pre-service training, to every Fellow Advisory session.[1]

---

[1] The training materials in this manual were developed through TNTP's partnership with UnCommon Schools' Taxonomy of Effective Teaching Practices team.  More information on the Uncommon Schools' Taxonomy of Effective Teaching Practices can be found at http://uncommonschools.org/our-approach/teach-like-a-champion.